RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANKITA SINGH,

*Defendant-Appellant*.

No. 24-3655

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:22-cr-00228-1—Jack Zouhary, District Judge.

Argued:  July 30, 2025

Decided and Filed:  August 8, 2025

Before:  CLAY, GILMAN, and BLOOMEKATZ, Circuit Judges.

───────────────

**COUNSEL**

───────────────

**ARGUED:**  Andrew P. Lemens, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellant.  Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  Andrew P. Lemens, Amy Mason Saharia, Clayton P. Phillips, Jason Howell Clayton, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellant.  Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

───────────────

**OPINION**

───────────────

RONALD LEE GILMAN, Circuit Judge.  A jury found Dr. Ankita Singh guilty on six counts of healthcare fraud, in violation of 18 U.S.C. § 1347.  On appeal, Singh argues that the district court committed three reversible errors.  First, she argues that the court incorrectly

instructed the jury on the meaning of the word "willfully" in the healthcare-fraud statute. She next contends that the court abused its discretion by excluding exculpatory statements made by Singh to an insurance-company investigator that reflected her then-existing state of mind. Finally, Singh argues that the court abused its discretion by allowing lay witnesses to testify that a provider must personally examine a patient in order to determine the medical necessity for certain prescribed equipment.

We find merit in all three of Singh's arguments. And because these errors were not harmless, we **VACATE** Singh's convictions and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

A.      **Factual background**

In 2018, while working as a hospital physician, Singh was recruited by Barton Associates, a firm that matches physicians with various healthcare companies. Barton introduced Singh to two telehealth companies: Real Time Physicians (Real Time) and Expansion Medical (Expansion). She contracted with both companies between 2019 and 2021 to perform "chart reviews." During that time, she allegedly believed that she was reviewing and approving medical charts for patients whom other healthcare providers had already evaluated, and who needed durable medical equipment (DME) such as orthotic knee, wrist, and back braces.

A Real Time representative told Singh that the contract position "involves chart reviews in our portal," that intake would be "done by our clinical staff for you," and that she would receive guidelines to evaluate whether the DME was medically necessary. "Chart review" is a practice where a physician reviews paperwork and notes generated by another healthcare provider who has personally treated the patient. For both companies, Singh was asked to review and approve completed charts for patients who were purportedly in need of DME.

Both companies were, in reality, perpetrating a nationwide scheme to defraud Medicare. The companies used paperwork signed by Singh and other physicians to place orders with providers of DME, who in turn submitted claims to Medicare.

On March 4, 2020, Singh received a voicemail from Kristine Whittaker, a representative from Optum Insurance Company, a division of United Health Group that provides insurance plans for Medicare beneficiaries. Singh returned the call 20 minutes later. Whittaker testified at trial that she contacted Singh during her investigation into potentially fraudulent Medicare claims submitted by Quality Lifestyle DME, a company not affiliated with Singh. Singh was not the focus of the investigation, and Optum did not issue a warning to Singh concerning her DME orders.

Whittaker recorded a contemporaneous summary of her conversation with Singh in a call log, prepared and maintained as part of Whittaker's report concerning her investigation into Quality Lifestyle DME. This summary of the call, which the district court excluded, reads as follows:

> Dr. Singh was asked if member [D.B.] was a patient of hers and if she ordered orthotics for her. Dr. Singh said she did not know if [D.B.] was her patient. She was asked if she practiced telehealth and she said yes. She said she worked with Barton Associates and Real Time Physicians. *She said she signs into a portal where she gets documents for patients who she believes have been evaluated by another provider.* She said she might have signed off on orthotics for [D.B.] (right knee brace with suspension sleeve billed on 10/10/2019). *She was under the impression the patients were actually examined because she said the documents appeared to be legitimate.* She said she would find document examples and email them and gave her email address.

(Emphasis added.) When Whittaker sent Singh a follow-up email so that Singh could send documents provided by Real Time, Singh promptly forwarded that email to her point of contact at Barton.

One year later, in March 2021, Singh was sent a letter by Humana, another healthcare insurer, containing an informal notice intended to "remind" medical providers of the relevant "rules and regulations surrounding the billing of Medicare claims." The letter informed Singh that irregularities in her DME orders were "indicative" of potential fraud. Singh promptly

forwarded the letter to her point of contact at Barton.  On May 5, 2021, Barton instructed Singh to stop completing orders for Expansion.  Singh stopped performing work for both Expansion and Real Time that same month.

A physician who has examined a patient in need of DME will typically submit a claim to Medicare for the payment of a medical exam corresponding to a subsequent order for DME.  But when Singh ordered DME for the patients in question, no claims were ever submitted for a corresponding medical exam.  Between 2019 and 2021, Singh ordered 11,769 braces for 3,202 Medicare beneficiaries, and Medicare paid $4,470,931.02 for these items.

No evidence showed that Singh herself ever submitted any order, claim, or request for reimbursement to Medicare, or that she knew the amounts being billed.  Singh reported as income on her federal income tax returns all the compensation that she received for completing chart reviews for Real Time and Expansion, which was approximately $78,000 over the roughly three-year period.

B.      **Procedural background**

The grand jury returned an indictment against Singh on six counts of healthcare fraud, in violation of 18 U.S.C. § 1347.  A four-day jury trial took place in February 2024.

The government argued that Singh had defrauded Medicare by signing DME orders for patients whom she had not personally evaluated.  It called as witnesses six patients for whom Singh had ordered DME.  These patients testified that they had never heard of Singh, that they never asked for DME, and yet they still received DME in the mail.  The government asked the jury to "infer" that Singh had a criminal intent from the "natural consequences" of her actions.  It emphasized the speed with which she had approved the otherwise-completed medical charts, and the fact that she did not personally consult with each patient.

The government also introduced testimony from three witnesses stating that a physician cannot determine if DME is medically necessary without personally examining the patient. The first of these three witnesses was Suzy Hartman, a Medicare investigator, who testified that Medicare guidelines require "a prior relationship with [a] patient," and that Dr. Singh "should be

evaluating that patient to determine their need and if [DME] is medically necessary." Aubrey Robinson, another Medicare investigator, next testified that she would expect a patient to "see [a] doctor" so that the physician could do an assessment before that physician ordered DME, and explained the "general rule" that a doctor would have a relationship with a patient before ordering DME. The last of these three witnesses was Dr. Kevin Phelps, who testified about training that he gave to Singh during her residency. He testified that a physician cannot develop a treatment plan or decide whether to order equipment without seeing or examining a patient. Phelps further testified that the patient examination was "part of the process" of determining medical necessity. None of the three, however, were qualified as an expert witness under Rule 702 of the Federal Rules of Evidence.

According to the government, the alleged scheme to defraud included over 5,900 claims related to more than 3,150 patients. These were the reimbursement claims submitted by third-party providers of DME that were associated with Singh's National Provider Identifier number but were not accompanied by a reimbursement claim for a consultation with Singh.

The government never contended that Singh knew that her conduct was illegal, or that such knowledge was a necessary element to sustain a conviction. Instead, the government argued to the jury in closing that "[i]t was on [Singh] to know [the] rules." The government asserted that Singh was liable because her signature on the DME orders was "essential" to the broader scheme.

Singh's defense centered on her lack of criminal intent. In her opening statement, Singh's attorney told the jury that Singh had a "good faith belief" that her conduct was lawful because "she thought she was doing chart reviews."

## II. ANALYSIS

### A.     The jury instructions

Federal law, specifically 18 U.S.C. § 1347, criminalizes "knowingly and willfully execut[ing]" a scheme to defraud a healthcare-benefit program. In *Bryan v. United States*, 524 U.S. 184, 193 (1998), the Supreme Court held that "knowingly" and "willfully" are distinct

levels of criminal intent. Whereas "knowingly" requires only proof of knowledge of the facts that constitute the offense, "[m]ore is required" with respect to conduct that is criminal only when done "willfully." *Id.* "[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Id.* at 191–92 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).

Applying *Bryan*, this court has held that "willfulness," in the criminal context, generally requires the government to prove that the defendant "acted with knowledge that his conduct was unlawful." *United States v. Roth*, 628 F.3d 827, 834 (6th Cir. 2011) (quoting *Bryan*, 524 U.S. at 191) (applying *Bryan* to the Arms Export Control Act, 22 U.S.C. § 2778); *see also United States v. Emmons*, 8 F.4th 454, 465, 478 (6th Cir. 2021) (noting *Bryan*'s application to the Federal Election Campaign Act, 52 U.S.C. § 30109(d)(1)(A)(i)); *United States v. Reichert*, 747 F.3d 445, 451 (6th Cir. 2014) (noting the parties' agreement that *Bryan* applies to the Digital Millennium Copyright Act, 17 U.S.C. § 1204(a)); *United States v. Chowdhury*, 169 F.3d 402, 406–07 (6th Cir. 1999) (applying *Bryan* to the marriage-fraud statute, 8 U.S.C. § 1325(c)).

Here, the jury instructions did not state that the government was required to prove that Singh "acted with knowledge that [her] conduct was unlawful." *See Bryan*, 524 U.S. at 192. The district court instead instructed the jury that "[a]n act is done 'knowingly and willfully' if it is done voluntarily and intentionally, and not because of mistake or some other innocent reason." This instruction failed to convey the scienter that the government must prove to secure a conviction under 18 U.S.C. § 1347.

On appeal, the government argues that the jury instructions, when considered as a whole, sufficiently conveyed that the government had to prove that Singh knew that her conduct was unlawful. The district court instructed the jury that the government had to prove that Singh acted with an "intent to defraud," which it defined as "an intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about a financial gain to oneself or another person." It also instructed the jury that a person who acts in "good faith" does not have an intent to defraud, stating that "[a] person who acts, or causes another person to act on a belief or opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong."

But a defendant might have an "intent to deceive" for "financial gain" without having knowledge that the relevant conduct is unlawful. For example, a college student who asks his parents for gas money, while really intending to use the money to buy a concert ticket, would likely have no contemplation that his conduct might be illegal. There is a difference, in other words, between having an "intent to deceive" and knowing that said deception violates the law. These states of mind might often overlap, but whether or not they do is a fact-specific inquiry for a jury to decide, not this court. In addition, the jury instruction did not tie an "intent to defraud" to a healthcare-benefit program, creating a risk of conviction for conduct beyond the statute's reach.

Here, the government's interpretation of the jury instructions contradicts what it told the jury at trial. In its closing argument, the government stated: "Now, defense says that if [Singh] had a reasonable belief that she was doing a chart review, that's a complete defense, and I completely disagree." The government went on to argue that "[i]t was on [Singh] to know the rules" and to tell the telehealth company "[t]his isn't right." This amounts to an argument that Singh could have had an "intent to defraud" without knowing that her conduct was unlawful.

As two of the government's witnesses testified, Medicare billing involves complicated regulations and complex reimbursement rules. Applying *Bryan's* definition of "willfully" to the healthcare-fraud statute is therefore necessary to avoid penalizing those who were unaware that their conduct was unlawful. *See Pfizer, Inc. v. Dep't Health & Hum. Servs.*, 42 F.4th 67, 77 & n.8 (2d Cir. 2022) (holding that, in the context of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), *Bryan's* definition of "willfully" is necessary to avoid penalizing those who were "unaware that such payments are prohibited by law").

We further note that other statutory schemes impose lower levels of criminal intent. The mail-fraud and wire-fraud statutes, for example, require only an intent to defraud, but the healthcare-fraud statute requires an intent to defraud *and* willfulness. *See* 18 U.S.C. §§ 1341, 1343, 1347. Interpreting the intent-to-defraud instruction to encompass "willfulness" would read the heightened scienter requirement out of the healthcare-fraud statute.

In reaching this conclusion, we recognize that the healthcare-fraud jury instructions were consistent with Sixth Circuit Pattern Instruction 10.05 (2024) and were agreed upon by both parties. If Singh had no other basis to justify the reversal of her convictions, we would need to grapple with the invited-error doctrine and apply the plain-error standard of review. But we have no need to reach these issues because we find merit in Singh's two other grounds for reversal, as discussed below. In sum, if there is any retrial, the jury instructions for a violation of 18 U.S.C. § 1347 must specify that the government is required to prove beyond a reasonable doubt that Singh acted with knowledge that her conduct was unlawful.

**B.      The hearsay statements made by Singh to Whittaker**

This brings us to the district court's exclusion of Singh's hearsay statements. At trial, Singh's attorney attempted to introduce exculpatory statements made by Singh to Whittaker, the Optum insurance investigator, during their March 4, 2020 phone call. Singh argues that the statements should have been admitted under Rule 803(3) of the Federal Rules of Evidence, and that the district court abused its discretion by excluding these statements.

### 1.   Standard of review

We review evidentiary rulings under the abuse-of-discretion standard. *United States v. Davis*, 577 F.3d 660, 666 (6th Cir. 2009). "An abuse of discretion will be found" if this court is left with a "definite and firm conviction that the court below committed a clear error of judgment." *Id.* (quoting *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003)).

### 2.   Singh's hearsay statements were admissible

Whittaker's summary of her phone call with Singh stated, in relevant part, that "[Singh] said she signs into a portal where she gets documents for patients who she believes have been evaluated by another provider" and that "[Singh] was under the impression the patients were actually examined because she said the documents appeared to be legitimate." Rule 803(3) of the Federal Rules of Evidence "provides an exception to the bar against hearsay for 'a statement of a declarant's then-existing state of mind (such as motive, intent, or plan) but not including a statement of memory or belief to prove the fact remembered or believed.'" *United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) (alterations adopted) (quoting Fed. R. Evid. 803(3)).

The district court ruled that Singh's statements to Whittaker were inadmissible under Rule 803(3), relying on *United States v. Mendez*, 303 F. App'x 323, 325–26 (6th Cir. 2008)). The defendant in *Mendez* participated in a kidnapping, but he later claimed that he did so under duress. Mendez made exculpatory statements to the police two days after the kidnapping while under police interrogation. *Id.* He argued that the statements made "two days after the kidnaping . . . reflected his state of mind at the time of the kidnaping." *Id.* at 326 (emphasis removed). This court upheld the exclusion of these statements about his state of mind *at the time of the kidnaping* because the statements were not made "contemporaneous with the kidnaping." *Id.*

But Singh's statements were not about a belief that she had held two days prior. They were about a belief that she held at the moment that she made the statements. Some of Singh's statements were explicitly made in the present-tense, about Singh's then-existing belief: "[Singh] said she signs into a portal where she gets documents for patients who she believes have been evaluated by another provider." These statements were admissible to prove that, on March 4, 2020, Singh believed that her portal patients had already been evaluated by other providers.

The district court ruled that the statements were not admissible because they were made "after the chart reviews and do not reflect [Singh's] state of mind at the time the conduct took place." But Singh was reviewing charts both before and after she spoke to Whittaker on March 4, 2020. A scheme to defraud is a continuing offense. *See, e.g.*, *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015). Singh's statements to Whittaker thus occurred in the middle of the alleged scheme.

The district court also held that Singh might have had the "opportunity to reflect and possibly fabricate or misrepresent [her] thoughts." But Whittaker left Singh a voicemail early in the morning of March 4, and Singh returned the call within 20 minutes. No evidence suggested that Whittaker's voicemail provided any information about the nature of her call, and Singh was not the focus of the investigation by Whittaker. There is no indication, in other words, that Singh had the opportunity to reflect and fabricate or misrepresent her thoughts. The present case is also readily distinguishable from *United States v. LeMaster*, 54 F.3d 1224, 1231–32 (6th Cir. 1995), where the defendant knew that he was under investigation by the FBI, and he "had 24 hours to

think about an explanation," which was sufficient time and notice to "fabricate one."   We conclude that the district court abused its discretion by not allowing these statements under Rule 803(3) of the Federal Rules of Evidence.

### 3. *Harmlessness*

"Evidentiary errors remain subject to harmless error review." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).   An evidentiary error is harmless if the record provides us with a "fair assurance" that the verdict was not "substantially swayed" by the error.   *United States v. Chavez*, 951 F.3d 349, 358 (6th Cir. 2020) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).   The government bears the burden of showing "that the error did not materially affect the verdict." *Kilpatrick*, 798 F.3d at 378 (citing *Kotteakos*, 328 U.S. at 764–65).   Here, the government has not met its burden.

The government argued at trial that the fact that Singh had been contacted by Whittaker served to warn Singh that there was "something wrong."   It also argued that Singh continued to approve charts for more than a year thereafter, and that this was evidence of Singh's criminal state of mind.   But evidence of Singh's belief that she was reviewing the work of other physicians would have contradicted the government's narrative that Singh knew that she was doing "something wrong."   This evidence is especially relevant given our holding that the government was required to prove that Singh "acted with knowledge that [her] conduct was unlawful." *See Bryan*, 524 U.S. at 191.

The excluded evidence went directly to the critical, disputed issue of Singh's intent.   We thus lack a "fair assurance" that the verdict was not "substantially swayed" by the error. *See Chavez*, 951 F.3d at 358 (citation omitted).   This means that the error was not harmless.

**C.     The district court's holding that the government did not need to produce an expert witness to establish that, if Singh ordered DME without ever examining the patients, then the DME was not medically necessary**

We now reach Singh's third claim of reversible error.   Before trial, Singh filed a motion in limine to prevent the government from presenting lay opinion testimony regarding the medical necessity of DME.   The district court denied Singh's motion, holding that the government did

not need to produce an expert to show that, if Singh ordered DME without personally examining the patients, then the DME was not medically necessary.

### 1. *Standard of review*

As stated above, we review evidentiary rulings under the abuse-of-discretion standard. *Davis*, 577 F.3d at 666. But plain-error review applies when a defendant fails to object to the evidence at trial. *Kilpatrick*, 798 F.3d at 378. Even if a party's motion in limine is denied, that party must again object at trial to preserve the issue for appeal, unless "the trial court has made an explicit and definitive ruling on the record . . . and has not indicated that the ruling is conditioned upon any other circumstances or evidence." *United States v. Poulsen*, 655 F.3d 492, 510 (6th Cir. 2011) (quoting *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)).

The government argues that plain-error review applies to this claim because Singh did not renew her objection at trial. But Singh argues that the district court's denial of her motion in limine was an "explicit and definitive ruling on the record," and that the issue is therefore preserved. *See Poulsen*, 655 F.3d at 510.

The district court explicitly, definitively, and unconditionally held that lay witnesses could testify that, if Singh ordered DME without ever examining the patients herself, then the DME was not medically necessary. We therefore conclude that the abuse-of-discretion standard applies.

### 2. *Lay testimony is inadmissible to prove that a provider cannot determine that DME is medically necessary without personally examining the patient*

The district court abused its discretion by allowing lay testimony on this issue. At trial, there was no evidence of any statute or Medicare regulation that bars a provider from determining if DME is medically necessary based on a written record (such as x-rays or notes from another provider who has examined the patient). Rule 701 of the Federal Rules of Evidence prohibits a lay witness from presenting opinion testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." And Rule 702 of the Federal Rules of Evidence requires that such testimony must come from an expert qualified "by

knowledge, skill, experience, training, or education" with respect to scientific, technical or other specialized knowledge.

The question here requires specialized knowledge of the professional standards of care for physicians and the established standards for Medicare. *See United States v. Lang*, 717 F. App'x 523, 537 (6th Cir. 2017) (holding that the defendant could not offer lay witnesses to "explain why treatment was medically necessary or appropriate"). The government regularly presents expert testimony to establish medical necessity. *See United States v. Hunt,* 521 F.3d 636, 645 (6th Cir. 2008) (crediting expert testimony that "an in-person examination would have been required" to determine whether diagnostic tests were medically necessary); *United States v. Martinez*, 588 F.3d 301, 307–08, 313 (6th Cir. 2009) (crediting expert opinions that the defendant's procedures and prescriptions were not medically necessary); *United States v. Volkman*, 797 F.3d 377, 389–90, 393–96 (6th Cir. 2015) (crediting expert testimony in evaluating whether prescriptions were written for a "legitimate medical purpose").

Here, the government never presented testimony from a qualified expert that Singh was required—either based on accepted standards for medical practice or under the complex Medicare regulatory scheme—to personally examine a patient in order to evaluate whether DME was medically necessary. Nor has the government cited any authority that has allowed a lay witness to provide such proof in analogous circumstances. We therefore conclude that the district court abused its discretion by allowing lay-witness testimony regarding medical necessity.

### 3. *Harmlessness*

Furthermore, the government has not proven beyond a reasonable doubt that, absent this error, the jury would have returned a guilty verdict. At trial, the government heavily relied on the fact that Singh had not personally examined patients as evidence that she had committed fraud.

The government also presented data from the Medicare claims that were associated with Singh's National Provider Identifier number. It argued that each DME claim was fraudulent if there was not a corresponding claim for a consultation. In closing, the government argued that

"[l]ogically you would expect if there's a DME being ordered, that, at some point in time, this physician would have had some relationship, some examination, but there wasn't any." But Singh contends that she had a good faith belief that other providers had previously examined the patients whose charts she was reviewing.

We thus lack a "fair assurance" that the verdict was not "substantially swayed" by the error. *See Chavez*, 951 F.3d at 358 (citation omitted). This means that the error was not harmless.

### III. CONCLUSION

For all the reasons set forth above, we **VACATE** Singh's convictions and **REMAND** for further proceedings consistent with this opinion.